CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

FEB 10 2011

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| RICHARD L. CAUVEL, II, *Plaintiff,* <br><br> v. <br><br> SCHWAN'S HOME SERVICE, INC., *Defendant.* | CASE NO. 6:10-cv-00012 <br><br> MEMORANDUM OPINION <br><br> JUDGE NORMAN K. MOON |

This matter is before the Court upon Plaintiff's Motion for Partial Summary Judgment, filed on January 10, 2011 (docket no. 41), and Defendant's Motion for Summary Judgment, filed on the same day (docket no. 43). The Court has diversity jurisdiction to hear this dispute. I have fully considered the arguments and authorities set forth in the parties' filings, as well as those presented at the January 26, 2011 hearing. For the following reasons, I will grant Defendant's Motion for Summary Judgment and will deny Plaintiff's Motion for Partial Summary Judgment as moot.

I. BACKGROUND

Plaintiff Richard L. Cauvel, II ("Cauvel") brought suit against Defendant Schwan's Home Service, Inc. ("Home Service") in the Circuit Court for Rockbridge County, Virginia, alleging breach of contract, quantum meruit, and unjust enrichment claims, and seeking $104,817 plus interest and costs. Home Service removed the matter to this Court on the basis of federal diversity jurisdiction (docket no. 1).

The following facts are not in dispute. Home Service is an online grocery store that offers food delivery to one's home. Cauvel's allegations arise out of his employment by Home

- 1 -

Service, for which Cauvel worked from March 1988 until his termination on April 26, 2008. In 2001, Cauvel signed an employment agreement with Home Service to serve as a Sales Manager (also referred to as a Local General Manager, or LGM), a position he held until he was terminated. As a Sales Manager, Cauvel was responsible for "the sales and distribution of frozen food products within an assigned territory." (Position Description, Ex. 4 to Def.'s Br. Supp. Mot. Summ. J.) Among other duties, Cauvel was responsible for implementing and maintaining "all governmental and corporate programs and policies" at his location. (*Id.*) He was also responsible for ensuring that "a team of Customer Service Managers maintain a system of routes that provide for regular servicing at residential homes or places of business to sell a large variety of frozen food products." (*Id.*)

During the course of his employment, there were occasions when Cauvel drove company vehicles, and Cauvel recorded the time he spent driving company vehicles in a company time log. (*See* Cauvel Dep. 46:22-47:8, July 27, 2010; *id.* 114:17-25; Time Log, Ex. 8 to Def.'s Br. Supp. Mot. Summ. J.) As a condition of his employment, Cauvel had to "meet the Federal Department of Transportation eligibility requirements, including appropriate driver's license and corresponding medical certification." (Position Description.)

Home Service maintains a "Fleet Safety Policies and Procedures" manual ("Manual"), which contains policies and procedures developed to ensure motor vehicle safety and compliance with federal, state, and local regulations. (Manual at A-1, Ex. 12 to Pl.'s Br. Opp'n.) The Manual "applies to all employees . . . who operate motor vehicles, other than passenger motor vehicles that are owned and/or operated on behalf of the company." (*Id.*) Cauvel received a copy of the Manual and acknowledged in writing that he read and understood the requirements, polices, and procedures expected of him. (Exs. 5-6 to Def.'s Br. Supp. Mot. Summ. J.)

In January 2007, Cauvel received a memorandum from the president of Home Service confirming his participation for the 2007 fiscal year in Home Service's Annual Incentive Plan ("AIP" or "Plan"), a program for rewarding, with a compensation bonus, an employee in Cauvel's position whose sales performance meets certain sales targets. (*See* Memorandum dated Jan. 18, 2007 and Plan, Ex. 9 to Def.'s Br. Supp. Mot. Summ. J.) Attached to the memorandum was a copy of the "Annual Incentive Plan Administrative Guidelines." (*Id.*) Cauvel had participated in the annual sales incentive program since he became a Sales Manager at Home Service, and he had been awarded bonuses in past years. (Pl.'s Br. Opp'n 4; Def.'s Reply 3.)

The 2007 Plan's administrative guidelines state, in pertinent part, as follows:

> The [employee] must be in good standing (i.e., in compliance with all applicable laws and company rules, regulations and policies) with the Company through the date payment is made to be eligible to receive an award under the [] AIP.
> . . .
> Executive management shall have full and final authority to . . . [d]esignate the amount, method and time of payment; . . . [c]onclusively interpret the provisions of the plan and resolve all issues arising from its application; [and] [a]dopt, amend or rescind the plan . . . .
> . . .
> The Company retains full and final authority to terminate, change, amend, administer and rescind this Plan at any time with or without notice for any reason.

(Plan at 1, 2, 4.).

After the close of the fiscal year, Home Service performed an internal audit of the financial reports of the company and determined that awards under the Plan "would be paid in full." (Def.'s Resp. to Pl.'s Interrog. No. 5, Pl.'s Br. Opp'n 11.) Cauvel attests that in an effort to earn a bonus under the Plan, he "worked many extra hours that year." (Cauvel Aff. ¶ 1, Jan. 19, 2011.) Based on Cauvel's sales performance in 2007, Home Service computed that he became eligible for a bonus in the amount of $104,817 under the Plan. (Location General

Manager Computation for 2007 Bonus, Ex. 11 to Def.'s Br. Supp. Mot. Summ. J.) At the national sales meeting in Las Vegas in January 2008, at which Cauvel was not present, Cauvel's supervisor accepted on Cauvel's behalf an oversized, non-negotiable check in the amount of $104,817. (Cauvel Dep. 96:5-9, 96:18-21, 98:9-13.) Then, at a ceremony in February, Cauvel was presented with an oversized check in the amount of $104,817, which he did not retain. (*Id.* 96:9-15, 99:1-6.) These oversized checks did not confer actual payment of the $104,817.

On February 10, 2008, Cauvel was arrested and charged in Virginia with driving while intoxicated ("DWI"), and his driver's license was suspended from February 10 through February 18. (Ex. 12 to Def.'s Br. Supp. Mot. Summ. J.; Cauvel Dep. 81:18-22, 86:16-20.) Cauvel did not report the arrest or the license suspension to his supervisor until he was confronted by his supervisor on February 27. (Cauvel Dep. 83:15-84:21.) As a result, Home Service suspended Cauvel from employment without pay and instructed him that he would be terminated at the end of a sixty-day period if he did not secure an acquittal of the DWI charge. (*Id.* 92:15-20.)

On March 15, 2008, during Cauvel's sixty-day suspension period from employment, Home Service distributed the Plan award payments to qualifying employees. (Cardoni Dep. 18:17-19, Nov. 16, 2010.) Cauvel was informed by his supervisor that he would not receive the award payment because he was not in good standing with the company. (Cauvel Dep. 95:12-96:3.) Upon the expiration of the sixty-day suspension period, Cauvel was terminated. (*Id.* 105:8-19.) Cauvel was later convicted of DWI. (*Id.* 86:24-25; Ex. 27 to Pl.'s Br. Opp'n.)

Prior to bringing this suit, Cauvel filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Western District of Virginia. Cauvel failed to list his potential claim against Home Service for the failure to pay the $104,817 as an asset on his bankruptcy petition, in violation of 11 U.S.C. § 521.

Cauvel disclosed the potential claim to his attorney, James O. Clough, before the bankruptcy petition was filed, but his attorney determined that he did not need to list the potential claim. (Cauvel Aff. ¶¶ 5, 8, Jan. 6, 2011; Clough Aff. ¶¶ 2-6, Jan. 7, 2011.) According to Clough's affidavit, Clough did not list the claim because "Cauvel did not intend, at that time, to file a lawsuit against Schwan's [Home Service]" and because Clough "did not feel that the potential claim against Schwan's [Home Service] had sufficient merit to include it as an asset." (Clough Aff. ¶ 6.) Clough asserts that he did not seek to knowingly withhold relevant information, and any omission was "inadvertent." (*Id.* ¶ 9.) When Clough learned that Cauvel filed the instant suit, the bankruptcy proceeding was reopened, and the claim against Home Service was disclosed to the bankruptcy court. (*See* Cauvel Aff., Jan. 6, 2011.) The bankruptcy court subsequently entered an order directing that Cauvel pay over to the bankruptcy trustee fifteen percent of any amount recovered from Home Service in excess of Cauvel's attorney fees and costs. (Ex. 11 to Pl.'s Br. Opp'n.)

In this litigation, Home Service asserts the affirmative defense of judicial estoppel. Cauvel's Motion for Partial Summary Judgment requests the Court to strike the defense of judicial estoppel. Home Service's Motion for Summary Judgment requests judgment in its favor on each of the claims asserted against it.

## II. APPLICABLE LAW

The Court has diversity jurisdiction over the action pursuant to 28 U.S.C. §§ 1332 and 1441. Virginia law governs the claims.

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to preclude summary judgment, the dispute about a material fact must be

"'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

Once a motion for summary judgment is properly made and supported, the non-moving party may not rely merely on allegations or denials in its own pleading, rather it must set out "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). When considering summary judgment motions, courts must view the facts in the light most favorable to the party opposing the motion. *Austin v. Clark Equip. Co.*, 48 F.3d 833, 835 (4th Cir. 1995). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The standard is the same for cross-motions for summary judgment. The court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotations omitted). If the court finds that there is a genuine issue of material fact, both motions must be denied. 10A THE LATE CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2010). "But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Id.*

### III. DISCUSSION

### A. Breach of Contract

I first address Home Service's motion for summary judgment on the breach of contract claim. The elements of a breach of contract claim under Virginia law are "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154, 671 S.E.2d 132, 135 (2009). Where a contract "is complete on its face" and "plain and unambiguous in its terms," the court should not search for its meaning beyond the instrument itself. *Ross v. Craw*, 231 Va. 206, 212, 343 S.E.2d 312, 316 (1986). Courts in Virginia "adhere to the view that contracts must be construed as written." *Id.* at 213, 343 S.E.2d at 316. The question whether a contract is ambiguous is one of law, *id.*, and contract interpretation is particularly suited for disposal by summary judgment, *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999). Here, no material facts are in dispute.

The question is whether Home Service breached any obligation it had under the Plan to pay Cauvel the $104,817 bonus for which he had become eligible to receive. Home Service contends that it was not obligated under the Plan to pay Cauvel the bonus. According to the Plan's administrative guidelines, "[t]he [employee] must be in *good standing* (i.e., in compliance with all applicable laws and company rules, regulations and policies) with the Company through the date payment is made to be eligible to receive an award." (Plan at 1) (emphasis added). Home Service argues that Cauvel was not in "good standing" on the date the awards were distributed because (1) Cauvel was on a term of unpaid suspension from employment on the date payment was made due to a pending charge of DWI in violation of Virginia law, and (2) Cauvel

did not report the suspension of his driver's license to his supervisor in violation of company policy as set forth in the Manual. Home Service adds that to the extent it is unclear whether Cauvel was in good standing, the Plan reserves for Home Service "full and final authority to . . . [c]onclusively interpret the provisions of the plan and resolve all issues arising from its application." (Plan at 2.)

In response, Cauvel argues that he was in good standing with the company despite his unpaid suspension from employment and the pending DWI charge. Cauvel contends that because only his DWI *charge* was pending on the date the bonuses were paid, and he had not yet been *convicted* of the charge, he was not out of compliance with any laws or company policies. I disagree. The term "compliance," as used in the language of the contract, does not specifically require a conviction in state court. Where Cauvel's conduct resulted in his arrest, his prosecution for a criminal misdemeanor, and the temporary suspension of his driver's license by the state, he was out of compliance with applicable laws pursuant to the Plan. Furthermore, based on this conduct, Home Service suspended Cauvel from employment without pay, and notified him that he would be terminated in sixty days unless he gained an acquittal of the DWI charge. Clearly, Home Service was justified in determining that Cauvel was not in good standing due to this sequence of events.

I also conclude that Cauvel's failure to report the suspension of his driver's license to his supervisor violated company policy and placed Cauvel not in good standing. The "Driver Responsibilities" section of the Manual states, in pertinent part, as follows:

> If you are employed as a driver and receive notice that your license to operate a motor vehicle has been revoked, suspended or withdrawn, alert your supervisor immediately following notice of such revocation, suspension or withdrawal.

> Upon receipt of any such notification, your supervisor will ensure that you are not permitted to operate a vehicle on behalf of the company during any period in which your driver's license has been canceled, revoked or suspended or if you have otherwise been disqualified from operating a commercial motor vehicle.

(Manual at B-2, Ex. 12 to Pl.'s Br. Opp'n.) The same section of the Manual states that the "term 'driver' refers to an employee who operates a motor vehicle, other than passenger vehicles, owned and/or operated on behalf of the company." (*Id.* at B-1.)

The "Management" section of the Manual provides the following:

> All drivers are required to notify their supervisor immediately if they are disqualified from operating a commercial motor vehicle for any period or if their driver's license is canceled, revoked or suspended. Upon receipt of any such notification, supervisors must ensure that no employee is permitted or allowed to operate a vehicle on behalf of the company during any period in which the employee's driver's license has been canceled, revoked or suspended or has otherwise been disqualified from operating a commercial motor vehicle.

(Manual at I-9, Ex. 14 to Pl.'s Br. Opp'n.)

Cauvel argues that the requirement to report a driver's license suspension to the driver's supervisor only applies to a person "employed as a driver," and Cauvel was a member of Home Service management who supervised drivers, and was not "employed as a driver" himself. I reject this position. The Manual defines a "driver" as an employee who operates a company vehicle. The uncontroverted evidence shows that as part of Cauvel's job as a Sales Manager, he was expected to operate company vehicles from time to time, and did in fact do so, as reflected by the driving time log. Therefore, the requirement set forth in the Manual to report a driver's license suspension applied to Cauvel. This interpretation finds further support in the Manual's statement that the purpose of notifying one's supervisor of a driver's license suspension is to enable the supervisor to ensure the disqualified driver does not operate a company vehicle.

Home Service has an equal interest in ensuring that all employees who drive company vehicles, regardless of their rank, do not operate company vehicles when they are not qualified to do so.[1]

Even if the Court determines that Cauvel was not in good standing at the time of payment, Cauvel argues that the good standing requirement is irrelevant because pursuant to the Plan, the award vests upon the approval of certified business unit results by Home Service top management. In this regard, the Plan states as follows:

> *When Awards are Paid*—Following completion of the audited financial position of the Company for the Plan Year, the Vice Chairman, President & CEO and Board of Directors will review and approve the annual financial report of the The Schwan Food Company and its subsidiaries. Actual payments will be made as soon as administratively possible thereafter. *Bonuses are not earned compensation until business unit results have been certified by the Company's auditors and approved by the Vice Chairman, President and Chief Executive Officer.*

(Plan at 4) (second emphasis added).

Cauvel proffers that the phrase "earned compensation" signifies "that the bonus became vested" upon certification and approval of business unit results and therefore an employee "did not have to be in 'good standing' through the date payment was made." (Pl.'s Br. Opp'n 14.) I do not find this interpretation convincing. The Plan does not define "earned compensation," and Cauvel does not direct the Court to any authority that would support construing it to mean that the bonus is irrevocably vested. In years when the business unit results are certified and approved prior to the date payment of the bonuses is made, Cauvel's interpretation would eliminate the clear requirement that receipt of payment is conditioned upon "good standing" as of the date of payment, based only on a strained reading of an unrelated phrase. A contract must be considered as a whole "without giving emphasis to isolated terms." *TM Delmarva Power,*

---

[1] Cauvel's various arguments that Home Service inconsistently applied the "good standing" standard are without merit and are rejected. (*See* Pl.'s Br. Opp'n 2, 8-10, 14.)

*L.L.C. v. NCP of Va., L.L.C.*, 263 Va. 116, 119, 557 S.E.2d 199, 200 (2002) (quoting *Am. Spirit Ins. Co. v. Owens*, 261 Va. 270, 275, 541 S.E.2d 553, 555 (2001)).

Home Service has conclusively shown that Cauvel failed to fulfill a valid condition precedent imposed upon his receipt of the bonus, and therefore Home Service did not breach the Plan by denying payment of the bonus to Cauvel. Because Cauvel cannot demonstrate breach of the Plan at trial, Home Service is entitled to judgment as a matter of law on the breach of contract claim.

### B. Quantum Meruit and Unjust Enrichment

Home Service also moves for summary judgment on the quantum meruit and unjust enrichment claims brought by Cauvel in alternative to his breach of contract claim. Under the theory of quantum meruit, recovery is available only in the absence of an "express, enforceable contract between the parties covering the services for which quantum meruit recovery is claimed." *Mongold v. Woods*, 278 Va. 196, 204, 677 S.E.2d 288, 292 (2009). Recovery for unjust enrichment is also only appropriate in the absence of an enforceable contract. *Weiler v. Arrowpoint Corp.*, No. 1:10-cv-157, 2010 U.S. Dist. LEXIS 46163, at *26, 2010 WL 1946317 (E.D. Va. May 11, 2010) (citing *Royer v. Bd. of County Supervisors*, 176 Va. 268, 10 S.E.2d 876 (1940)).

Here, an express contract, the Plan, governed the matter of Cauvel's bonus. If the Plan is an enforceable contract, Cauvel will be unable to recovery in equity for his services. Cauvel argues that the Plan is void for lack of mutuality because under the "Plan Termination or Changes" heading of the Plan's administrative guidelines, Home Service retained "full and final authority to terminate, change, amend, administer and rescind this Plan at any time with or without notice for any reason." (Plan at 4.) Under Virginia law, "if it appears that one party was

never bound on its part to do the acts which form the consideration for the promise of the other, there is a lack of mutuality of obligation and the other party is not bound." *Busman v. Beeren & Barry Invs., LLC*, 69 Va. Cir. 375, 378 (Va. Cir. Ct. 2005). Mutuality of obligation exists when each party has exchanged promises in which each must be bound to act or refrain from acting. *C. G. Blake Co. v. W. R. Smith & Son, Ltd.*, 147 Va. 960, 972, 133 S.E. 685, 688 (1926). The doctrine of mutuality of obligation is "one aspect of the rule that mutual promises constitute considerations for each other." *Turner v. Hall*, 128 Va. 247, 251, 104 S.E. 861, 863 (1920). The modern trend is to call a lack of mutuality of obligation a "lack of consideration because of the illusory or optional nature" of the promise. *Wexford Bancorp, L.L.C. v. Concept 1, L.L.C.*, 66 Va. Cir. 72, 73 (Va. Cir. Ct. 2004).

The issue is whether the clause authorizing Home Service to terminate the Plan at any time without notice rendered illusory Home Service's conditional promise to pay a bonus, which was its consideration for the contract. In *American Agricultural Chemical Co. v. Kennedy*, the court refused to enforce a contract for the sale of fertilizer because the contract stated that the seller "reserve[s] the right to cancel this contract at any time . . . ." 103 Va. 171, 174, 48 S.E. 868, 869 (1904). The court reasoned that "[i]n this case the plaintiff made a proposition to sell, which the defendant accepted, but the plaintiff's offer left it optional with it whether or not it would sell. It did not bind itself to sell." *Id.* at 178, 48 S.E. at 871. "[N]either party was bound at that time. The plaintiff, after that time, never did any act or made any promise which bound it to complete the contract. . . . In the absence of such obligation on the part of the plaintiff, and of such right on the part of the defendants, there never was a binding engagement between the parties which a court of law would enforce." *Id.*

*American Agricultural Chemical* left open the question whether a later act or promise on the part of a party would render the agreement enforceable. This issue was taken up in *Schwam v. XO Commc'ns, Inc.*, No. 05-1060, 2006 U.S. App. LEXIS 7428 (4th Cir. Mar. 24, 2006), in which a former employee sued his employer for breach of contract and unjust enrichment to recover sales commissions allegedly owed him under a sales incentive plan. Under the incentive plan, the employer reserved the right to "amend, modify, interpret, or terminate the [incentive plan] at any time." 2006 U.S. App. LEXIS 7428 at *2. With respect to the unjust enrichment claim, the employee argued that the clause reserving the right to terminate the incentive plan at any time "renders any consideration given by [the employer] illusory because [the employer] can modify or terminate the plan at its discretion, and that makes the [incentive plan] unenforceable." *Id.* at *7. Applying Virginia law, the court rejected the employee's argument and held that the incentive plan was enforceable because the employer "performed numerous acts" indicating its intent to be bound by the incentive plan. *Id.* at *9; *see also Gay Nineties, Inc. v. Int'l Dining Club*, 21 Va. Cir. 492, 494 (Va. Law & Eq. Ct. 1973) ("[*American Agricultural Chemical*] makes it clear that where performance is offered and accepted by both parties, the necessary mutuality comes into existence even though it did not exist in the beginning."). The court distinguished *American Agricultural Chemical* by the fact that the seller in that case never performed any post-formation acts consistent with its original promise. *Id.* The court added that "the test of mutuality of obligation of a contract is to be applied not as of the time when the promises are made but as of the time when the contract is sought to be enforced. *Id.* (quoting 17A AM. JUR. 2D *Contracts* § 22 (2005)); *see also Asberry v. Mitchell*, 121 Va. 276, 283, 93 S.E. 638, 640 (1917) (testing mutuality of obligation at the time a party sought to enforce the contract).

*Schwam* speaks with particular clarity to the facts of this case. Both *Schwam* and the present matter involve a sales incentive plan in which the employer reserved a right to cancel the plan at any time, but took steps consistent with the terms of the plan that indicated the employer's intent to be bound by it. Although Home Service's promise to pay a bonus for sales performance that exceeded certain targets was subject to amendment or cancellation by Home Service at any time and for any reason, Home Service bound itself to its promise through its subsequent actions, in which Home Service treated the Plan as an enforceable contract. For example, after performing an internal audit of the financial reports of the company, Home Service determined that awards under the Plan for the fiscal year 2007 would be paid in full. Home Service proceeded to calculate the amount of bonus compensation Cauvel was eligible to receive due to his performance in that year, and presented, in two award ceremonies, two oversized checks made out in Cauvel's name with the amount of $104,817 printed on them. In addition, Home Service distributed bonuses under the Plan to employees who it determined satisfied the conditions for receipt of awards. For the entire period governed by the Plan, from the beginning of the sales performance period to the date of payment of the bonus awards, there is no evidence that Home Service terminated or modified the terms of the Plan. On the contrary, the evidence in the record shows that Home Service operated in a manner consistent with the terms of the agreement. It cannot now be said that the Plan is unenforceable simply because Home Service was not initially bound to pay the bonus as promised. *Cf. Philip Morris USA, Inc. v. Appalachian Fuels, LLC*, No. 3:08-cv-527, 2009 U.S. Dist. LEXIS 31765, at *14-15, 2009 WL 1011650 (E.D. Va. Apr. 15, 2009) (finding a requirements contract for purchase of coal binding under Virginia law in part because the parties operated under the contract for almost two years).

The Plan is an enforceable contract between the parties that expressly covers the services for which recovery is sought. Therefore, Cauvel cannot succeed on his quantum meruit and unjust enrichment claims, and Home Service is entitled to judgment as a matter of law.

### C. Judicial Estoppel

Home Service also argues that the doctrine of judicial estoppel bars Cauvel from recovering on each of his asserted claims because Cauvel failed to disclose the potential claim against Home Service as an asset to the bankruptcy court. Cauvel's motion for partial summary judgment seeks to strike Home Service's defense of judicial estoppel.

Judicial estoppel "is an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001); *see also Folio v. City of Clarksburg*, 134 F.3d 1211, 1217 (4th Cir. 1998) ("Judicial estoppel is an equitable doctrine that exists to prevent litigants from playing 'fast and loose' with the courts."). Because Home Service is entitled to summary judgment on each of the claims asserted against it, I decline to consider the parties' arguments regarding judicial estoppel. Cauvel's motion for partial summary judgment will be denied as moot.

### IV. CONCLUSION

For the reasons stated herein, the Court will grant Home Service's Motion for Summary Judgment, and will deny as moot Cauvel's Partial Motion for Summary Judgment. An appropriate order will follow.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this 10th day of February, 2011.

                                                   NORMAN K. MOON
                                                   UNITED STATES DISTRICT JUDGE